**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| NICHOLAS OLENIK, Individually and on Behalf of All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant EARTHSTONE ENERGY, | : : : : : : | |
| Plaintiff, | : : | |
| v. | : : | **C.A. No. 2017-0414-JRS** |
| FRANK A. LODZINSKI, RAY SINGLETON, DOUGLAS E. SWANSON, BRAD THIELEMANN, ROBERT L. ZORICH, JAY F. JOLIAT, ZACHARY G. URBAN, ENCAP INVESTMENTS L.P., BOLD ENERGY III LLC, BOLD ENERGY HOLDINGS, LLC and OAK VALLEY RESOURCES, LLC, | : : : : : : : : : : : | |
| Defendants, | : : | |
| and | : : | |
| EARTHSTONE ENERGY, INC., a Delaware corporation, | : : : | |
| Nominal Defendant. | : | |

**MEMORANDUM OPINION**

Date Submitted: April 20, 2018
Date Decided: July 20, 2018

Ned Weinberger, Esquire and Thomas Curry, Esquire of Labaton Sucharow LLP, Wilmington, Delaware; Peter B. Andrews, Esquire, Craig J. Springer, Esquire and David Sborz, Esquire of Andrews & Springer LLC; and Jeremy S. Friedman, Esquire, Spencer Oster, Esquire and David F.E. Tejtel, Esquire of Friedman Oster & Tejtel PLLC, New York, New York, Attorneys for Plaintiff.

Kenneth J. Nachbar, Esquire, D. McKinley Measley, Esquire and Lauren Neal Bennett, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Gerard G. Pecht, Esquire of Norton Rose Fulbright US LLP, Houston, Texas; and Peter A. Stokes, Esquire and William Patrick Courtney, Esquire of Norton Rose Fulbright US LLP, Austin, Texas, Attorneys for Defendants Frank A. Lodzinski, Ray Singleton and Bold Energy III LLC, and Nominal Defendant Earthstone Energy, Inc.

Rolin P. Bissell, Esquire and James M. Yoch, Jr., Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware and Michael C. Holmes, Esquire, Craig E. Zieminski, Esquire, Amy T. Perry, Esquire, Kent Piacenti, Esquire, Meredith S. Jeanes, Esquire of Vinson & Elkins LLP, Dallas, Texas, Attorneys for Defendants Douglas E. Swanson, Brad Thielemann, Robert L. Zorich, EnCap Investments L.P., Bold Energy Holdings, LLC, and Oak Valley Resources, LLC.

Raymond J. DiCamillo, Esquire, Robert L. Burns, Esquire and Daniel E. Kaprow, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Jay Joliat and Zachary Urban.

**SLIGHTS, Vice Chancellor**

This litigation arises out of an all-stock "Up-C" business combination between Earthstone Energy, Inc. ("Earthstone" or the "Company") and Bold Energy III LLC ("Bold") whereby Earthstone's legacy stockholders ended up owning approximately 38.9% of the combined company (the "Transaction"). The Transaction was negotiated and approved on Earthstone's behalf by a special committee of independent and disinterested directors (the "Special Committee"). From the outset of the negotiations of the Transaction, Earthstone's proposal to Bold was explicitly conditioned on Special Committee approval and majority-of-the-minority stockholder support. Earthstone stockholders voiced their support of the Transaction in a "yes" vote where 83.6% of the issued and outstanding shares participated, and 99.7% of the non-affiliated shares (shares not held by Earthstone's executive officers or by Earthstone's largest stockholder, Oak Valley Resources, LLC ("Oak Valley")) approved the Transaction. The Transaction closed on May 9, 2017.

Plaintiff, Nicholas Olenik, is an Earthstone stockholder. With the benefit of documents obtained under 8 *Del. C.* § 220 ("Section 220 Documents"), Olenik has brought a Verified Amended Stockholder Class Action and Derivative Complaint (the "Complaint"),[1] in which he alleges that Earthstone's board of directors, certain

---

[1] Citations to the Complaint are to "Compl. ¶ __."

Earthstone officers and it supposed controlling stockholder, Oak Valley, breached their fiduciary duties to Earthstone's minority stockholders by approving the unfair Transaction for the benefit of Oak Valley and EnCap Investments, L.P. ("EnCap"). EnCap is a private equity firm with majority stakes in both Bold and Oak Valley. Olenik also alleges that Bold, Bold Holdings LLC (an acquisition vehicle), EnCap and Oak Valley aided and abetted those breaches.

In this Memorandum Opinion, I conclude that Earthstone structured the Transaction in the manner prescribed by *Kahn v. M & F Worldwide Corp.* in order to trigger the presumptions of the business judgment rule.[2] Under the business judgment rule standard of review, the Court will not second-guess the decisions of corporate fiduciaries unless the Transaction is so inexplicable as to constitute waste. Olenik has not expressly pled waste and the Complaint does not plead facts from which the Court can reasonably conceive that waste occurred here. Accordingly, the Complaint must be dismissed.

---

[2] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 645–46 (Del. 2014) (setting forth a framework by which a transaction with a controlling stockholder can be structured so that it replicates arms-length negotiations and invokes the business judgment rule standard of review).

# I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to the Complaint and judicially noticeable facts available in public Securities and Exchange Commission filings.[3] For purposes of this motion to dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[4]

## A. The Parties and Relevant Non-Parties

Plaintiff, Olenik, is and has been a record owner of shares of Earthstone common stock at all times relevant to this litigation.[5] His Complaint pleads both direct and derivative claims.

Nominal defendant, Earthstone, is a Delaware corporation that operates in the "upstream" oil and natural gas sector.[6] Its primary assets are located in the Midland

---

[3] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (noting that trial courts may take judicial notice of facts in SEC filings that are "*not* subject to reasonable dispute") (emphasis in original).

[4] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169.

[5] Compl. ¶ 20.

[6] Compl. ¶¶ 21, 38. The oil and gas industry is generally divided into "upstream," "downstream" and "midstream" operations. Upstream operations are those focused on the identification of oil and gas deposits, well drilling and the recovery of raw materials from underground. Compl. ¶ 38 n.3. Downstream operations are those focused on turning raw materials into usable products (such as gasoline) and marketing those products. *Id.* Midstream operations are those focused on linking upstream and downstream operations

3

Basin of west Texas, the Eagle Ford Shale of south Texas and the Williston Basin of North Dakota.[7]  At the time of the Transaction, Earthstone was a mature company with increasing revenue each year between 2012 and 2016, but with limited undeveloped resources.[8]  As announced to its stockholders prior to the Transaction, given the state of its asset portfolio, Earthstone's "business model" contemplated "active [participation] in corporate mergers and the acquisition of oil and natural gas properties that have production and future development opportunities."[9]

Earthstone's board of directors (the "Board") at the time of the Transaction comprised Frank Lodzinski, Ray Singleton, Douglas Swanson, Brad Thielemann, Robert Zorich, Jay Joliat, Zachary Urban and Phillip Kramer.[10]  Wynne Snoots Jr. joined in May 2017, expanding the Board to nine directors.[11]

---

through resource transportation and storage, including the operation of pipelines and gathering systems.  *Id.*

[7] Compl. ¶ 38.

[8] Compl. ¶ 3; *see* Proxy Statement at 18, 22.

[9] Compl. ¶ 38; Earthstone Energy, Inc., Annual Report (Form 10-K) (Mar. 15, 2017) ("Earthstone 2016 Annual Report") at 8.

[10] Compl. 1, ¶ 35.  Kramer joined the Earthstone Board in October 2016, after negotiations had already commenced but before Earthstone announced the Transaction on November 8, 2016.  Compl. ¶¶ 22, 35.  Plaintiff initially brought claims against Kramer but has since voluntarily dismissed those claims.  Dkt. 34.

[11] Compl. ¶ 36.

Defendant, EnCap, is a Delaware limited partnership that operates as a private equity and venture capital firm.[12] EnCap bills itself as "the leading provider of venture capital to the independent sector of the U.S. oil and gas industry."[13]

Defendant, Oak Valley, is a Delaware limited liability company that functions as a holding company for the stated purpose of pursuing investment opportunities in upstream oil and gas companies.[14] Lodzinski founded Oak Valley in December 2012, and served as Oak Valley's President and Chief Executive Officer until December 2014.[15] EnCap and its affiliates own approximately 57.3% of the membership interests in Oak Valley.[16] Since its initial investment one week after Oak Valley's founding, EnCap has been Oak Valley's largest investor.[17] Oak Valley, in turn, owns 41.1% of Earthstone's outstanding common stock.[18] Thus,

---

[12] Compl. ¶¶ 2, 22.

[13] Compl. ¶ 22.

[14] Compl. ¶¶ 25, 42.

[15] Compl. ¶¶ 26, 39, 42.

[16] Compl. ¶ 44; Earthstone Energy, Inc., Definitive Proxy Statement (Schedule 14A) (Apr. 7, 2017) ("Proxy Statement") at 69.

[17] Compl. ¶ 44.

[18] Compl. ¶ 22; Earthstone 2016 Annual Report at 28; Proxy Statement at 117.

while EnCap indirectly owns 23.6% of Earthstone, it "may be deemed to own beneficially 41.1%."[19]

Defendant, Bold, is a Texas limited liability company.[20] Bold was formed in March 2013, and is 95.9% owned by EnCap.[21] It is an early-stage oil and gas company engaged in the acquisition, exploration and development of oil and gas properties in west Texas and southeastern New Mexico.[22] Bold's assets "consist principally of undeveloped acreage in the Midland Basin" located within the greater Permian Basin.[23] As compared to Earthstone, Bold generated far less revenues but owned approximately three-times more undeveloped resources.[24]

---

[19] Proxy Statement at 2. *See also* Compl. ¶¶ 22, 150. "[B]eneficial ownership contemplates a separation of legal and equitable ownership. Under this concept, the equitable or beneficial owner possesses an economic interest in the subject property distinct from legal ownership or control." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1176 (Del. 1988).

[20] Compl. ¶¶ 23, 64.

[21] Compl. ¶¶ 4, 64.

[22] Compl. ¶¶ 4, 23, 64.

[23] Compl. ¶¶ 4, 67 (citing ESTE000517); Transmittal Aff. of James M. Yoch, Jr. in Supp. of the EnCap and Oak Valley Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Verified Am. S'holder Class Action and Deriv. Compl. ("Yoch Aff."), Ex. 4 ("Stephens Presentation (Nov. 7, 2016)") at ESTE000517. *See also* Proxy Statement at 30.

[24] Proxy Statement at 18–19, 22.

Defendant, Bold Holdings, is a Texas limited liability company that was established as a vehicle to facilitate the Transaction.[25] Specifically, Bold Holdings was the vehicle through which Bold contributed its assets to the combined company, and was also the entity through which Bold's members would hold their equity in the combined company following the closing of the Transaction.[26]

Defendant, Lodzinski, has served as Earthstone's Chairman, President and CEO since December 2014.[27] Lodzinski founded Oak Valley, owns a non-controlling interest in that entity, serves on its board of managers and served as its President and CEO until December 2014.[28] He has over forty-three years of experience in the oil and gas industry.[29] During those forty-three years, Lodzinski has founded four entities and served on the board of directors or in management at approximately ten entities.[30] According to a news article cited in the Complaint, Lodzinski produced impressive returns for at least four companies in which he was involved in a leadership capacity: (1) Hampton Resources – 30% return to preferred

---

[25] Compl. ¶ 24.

[26] Proxy Statement at i, 20.

[27] Compl. ¶¶ 7, 26.

[28] Compl. ¶¶ 7, 26, 39, 42, 47.

[29] Proxy Statement at 102.

[30] *Id.*

investors and 700% to initial investors; (2) Texoil – 250% return to preferred investors, 300% to follow-on investors and 1,000% to initial investors; (3) Aroc – 17% return to preferred investors and 400% to initial investors; and (4) Southern Bay – 40% return to initial investors.[31]

Defendant, Singleton, has been an Earthstone director since July 1989.[32] He served as Earthstone's President and CEO from March 1993 until December 2014, when he transitioned into the role of Executive Vice President of Earthstone's Northern Region.[33]

Defendants, Swanson, Thielemann, Zorich, Joliat and Urban, each have served on the Board since December 2014.[34] Joliat and Urban served as the only two members of the Earthstone Special Committee formed to consider and negotiate the Transaction.[35] Both own a membership interest in Oak Valley.[36] Urban also currently serves as CEO at Vlasic Group, a private investment company with

---

[31] Nissa Darbonne, *Look Who's Doing It Again: Frank Lodzinski*, Oil and Gas Investor (June 23, 2014, 3:58 PM), https://www.oilandgasinvestor.com/blog/look-whos-doing-it-again-frank-lodzinski-564526#p=full (cited by Compl. ¶ 183 n.26).

[32] Compl. ¶ 27.

[33] *Id.*

[34] Compl. ¶¶ 28–32.

[35] Compl. ¶¶ 31–32.

[36] Compl. ¶¶ 31–32.

"a history over nearly thirty years of making investments in companies led by Lodzinski."[37]  According to the Complaint, Vlasic Group holds a 7.5% voting interest in Oak Valley and has backed five different Lodzinski companies dating back to 1988.[38]

Swanson, Thielemann and Zorich have affiliations with EnCap:  Swanson has been an EnCap managing partner since 1999[39]; Thielemann has served as an EnCap managing director since 2006[40]; and Zorich co-founded EnCap in 1988 and serves as a managing partner.[41]  Swanson and Zorich both serve on Oak Valley's board of managers.[42]

Non-party, Kramer, has been an Earthstone director since October 2016.[43] Non-party, Snoots, has been an Earthstone director since May 2017.[44]

---

[37] Compl. ¶ 32.

[38] Compl. ¶¶ 97, 183.  Lodzinski, Singleton, Swanson, Thielemann, Zorich, Joliat and Urban are collectively referred to as the "Director Defendants."

[39] Compl. ¶ 28.

[40] Compl. ¶ 29.

[41] Compl. ¶ 30.

[42] Compl. ¶¶ 28, 30.

[43] Compl. ¶ 35.

[44] Compl. ¶ 36.

## B. The Earthstone-Oak Valley Reverse Merger in December 2014

In December 2014, Earthstone issued to Oak Valley a controlling share of its common stock—approximately 9.1 million shares—in exchange for Oak Valley contributing its membership interests in three subsidiaries to Earthstone (the "Reverse Merger").[45] After the Reverse Merger closed in December 2014, Oak Valley owned 84% of Earthstone's common stock.[46] With control of the company in hand, Oak Valley installed six new members on Earthstone's then-seven member board of directors, and each of these six directors—Lodzinski, Swanson, Thielemann, Zorich, Urban and Joliat—remained on the Board throughout the time relevant to this litigation.[47] Oak Valley also installed new management, placing Lodzinski at the helm as Earthstone's President, CEO and Chairman of the Board, positions he continued to hold throughout the negotiations and consummation of the Transaction.[48] To make room for Lodzinski as CEO, Singleton stepped down from that post and became Executive Vice President of Earthstone's Northern Region.[49]

---

[45] Compl. ¶ 39–40.

[46] Compl. ¶ 40.

[47] Compl. ¶ 49.

[48] Compl. ¶¶ 26, 50.

[49] Compl. ¶ 50.

10

"[F]ollowing the Reverse Merger, Lodzinski and Earthstone pursued a year-long acquisition spree that created significant value for the Company and positioned it for success."[50]  One such acquisition was of Lynden Energy Corp. ("Lynden Corp."), which provided Earthstone with a non-operated working presence in a section of the Permian Basin in Texas, the Midland Basin, where Bold also operates.[51]  As a result of these acquisitions, Earthstone grew from a micro-cap company into a small-cap company.[52]

## C.  Bold's Market Check in June 2015

"Oil and gas exploration companies like Bold require large amounts of cash to fund drilling operations" and "are constantly looking for ways to raise capital to meet their heightened cash needs."[53]  By the summer of 2015, EnCap was reaching the end of its capital commitments to entities, including Bold, that were sponsored through one of its funds.[54]  "As a result, EnCap was looking to take Bold public without having to invest additional capital of its own."[55]  In or around June 2015,

---

[50] Compl. ¶ 55.

[51] Compl. ¶¶ 23, 64; Proxy Statement at 46.  The Earthstone-Lynden Corp. transaction closed in May 2016.  Proxy Statement at 29, 46.

[52] Compl. ¶ 60.

[53] Compl. ¶ 66.

[54] Compl. ¶¶ 64–65.

[55] Compl. ¶ 65.

11

Bold retained Tudor, Pickering, Holt & Co. ("TPH") to "determine whether there was a market for Bold's assets."[56] After an "extensive" three-month market check, no buyer for Bold emerged.[57] Around this same time, oil prices tumbled, which caused "exponentially more stress on smaller companies like Bold."[58]

By the time the Special Committee was considering the Transaction, it was well aware of Bold's condition. Indeed, minutes of a July 22, 2016 Special Committee meeting state:

> Bold does not have enough cash and drilling capacity to continue to run the company even with its final capital call to EnCap (which it intends to make in the next week). [It was] noted that [] even though EnCap will have finished making its capital commitment to Bold, it will continue funding Bold.
>
> Mr. Lodzinski then advised that he believes EnCap is looking to sell Bold because it is in EnCap's Fund 9 and EnCap has started its Fund 10, EnCap has reached its total capital commitment and EnCap does not think that the current management of Bold could take the [c]ompany public.[59]

---

[56] Compl. ¶ 68 (quoting Proxy Statement at 46).

[57] Compl. ¶ 68.

[58] Compl. ¶ 67.

[59] *Id.*; Transmittal Aff. of Lauren Neal Bennett in Supp. of the Opening Br. in Supp. of the Earthstone Defs.' Mot. to Dismiss Am. Compl. ("Bennett Aff."), Ex. L ("Special Committee Meeting Minutes (July 22, 2016)") at ESTE000075.

**D. Earthstone Searches for Acquisition Targets in June 2015**

On June 25, 2015, Earthstone met with Wells Fargo Securities LLC ("Wells Fargo") to discuss potential acquisition targets for Earthstone.[60] Wells Fargo's list of potential targets included Bold.[61] At the Board's direction, Wells Fargo contacted one of the potential targets on Earthstone's behalf, but those discussions did not mature.[62] The Board ultimately determined that it would not pursue the other identified targets for a variety of reasons, including that several of the companies had valued their assets above market while others indicated they would only be amenable to all cash offers which was not the deal structure preferred by Earthstone's management.[63]

As for Bold, Earthstone was informed of Bold's market check and that bids were due in August 2015.[64] Earthstone believed that Bold's assets were economically attractive. Nevertheless, the Board chose not to pursue the opportunity due to the size of Bold's acreage position, Bold's limited production and uncertainty surrounding Earthstone's ability to obtain adequate cash financing, "particularly

---

[60] Proxy Statement at 46.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

considering the anticipated volatility in commodity prices and Earthstone's likely acquisition of Lynden Corp. with Earthstone common stock."[65]

**E. Lodzinski Explores an Earthstone-Bold Transaction in November 2015**

In the late fall, Earthstone learned that Bold's efforts had not yielded a bidder. Upon hearing this news, Lodzinski initiated discussions with EnCap regarding Bold and other EnCap portfolio companies that might fit as potential Earthstone acquisition targets.[66]

On November 12, 2015, EnCap provided Lodzinski and Earthstone management with a presentation that TPH had used earlier in the year to market Bold to potential buyers.[67] Five days later, on November 17, 2015, Lodzinski and Earthstone management held a conference call with EnCap to discuss a possible combination of Earthstone and Bold.[68] Plaintiff alleges, "Lodzinski's team expressed their view that a combination could be beneficial to both parties, and committed to immediately begin a comprehensive review of Bold's assets."[69]

---

[65] *Id.* Earthstone ultimately announced the Earthstone-Lynden Corp. transaction in December 2015, and the transaction closed in May 2016. *Id.*

[66] Compl. ¶ 69; Proxy Statement at 46.

[67] Compl. ¶ 72; Proxy Statement at 46.

[68] Compl. ¶ 72; Proxy Statement at 46.

[69] Compl. ¶ 72. *See also* Proxy Statement at 46.

Two days later, Earthstone entered into a confidentiality agreement with EnCap to govern the exchange of financial information concerning Bold.[70] Throughout late November and early December 2015, EnCap provided Earthstone management with access to the data room that TPH had created for Bold's market check earlier that year.[71]

Discussions between EnCap and Earthstone concerning Bold continued into December 2015. On December 8, 2015, Earthstone entered into a separate confidentiality agreement with Bold to govern Earthstone's review of technical, operational, financial and analytical information prepared by Bold and TPH.[72] Two days later, on December 10, 2015, TPH presented a technical overview of Bold's assets to Earthstone and EnCap.[73] Then, on December 18, 2015, TPH, Earthstone and EnCap held a follow-up meeting to discuss Bold's land, infrastructure issues and a development model for the properties.[74]

From mid-December 2015 through mid-January 2016, Lodzinski and his team met with three investment banking firms to solicit their views on valuation

---

[70] Compl. ¶ 73; Proxy Statement at 46.

[71] Compl. ¶ 73; Proxy Statement at 46–47.

[72] Compl. ¶ 74; Proxy Statement at 47.

[73] Compl. ¶ 74; Proxy Statement at 47.

[74] Compl. ¶ 74; Proxy Statement at 47.

parameters related to Bold's assets, methods to fund their development, and equity market receptivity to the potential acquisition of Bold's assets.[75]  Discussions halted in mid-January 2016, however, when the price of oil fell to a 12-year low.[76]

## F.  Lodzinski Re-engages with EnCap

By April 2016, conditions in the oil and gas industry were showing signs of improvement.[77]  On April 27, 2016, Lodzinski provided the Board with a letter he described as "a comprehensive status update" in which he discussed Earthstone's operations in advance of the Board's regularly scheduled May 3, 2016 meeting.[78] The letter mentioned Bold once, under a heading "Current Deals Working," where Lodzinski stated, "b. Bold – *updating* analysis and intend to make offer."[79] The letter said nothing of conditioning a proposal to Bold on approval of an independent special committee or a majority-of-the-minority stockholder vote.[80]

---

[75] Compl. ¶ 75; Proxy Statement at 47.

[76] Compl. ¶ 76; Proxy Statement at 47.

[77] Compl. ¶ 79.

[78] *Id.* (quoting ESTE000001); Bennett Aff., Ex. E ("Lodzinski Board Status Update Letter (Apr. 27, 2016)") at ESTE000001.

[79] Compl. ¶ 80 (citing ESTE000007); Lodzinski Board Status Update Letter (Apr. 27, 2016) at ESTE000007 (emphasis added).  The reference to "updating" suggests that Lodzinski had discussed Bold with the Board previously.

[80] Compl. ¶ 80.

On April 29, 2016, Lodzinski and the Earthstone management team restarted discussions with EnCap regarding a potential Earthstone-Bold combination.[81] At that time, EnCap, through Oak Valley, indirectly held greater than a 50% voting interest in Earthstone.[82]

## G. The May 3, 2016 Earthstone Board of Directors Meeting

The Board met on May 3, 2016, as scheduled, and all members were in attendance as well as two members of management, including Robert Anderson, Executive Vice President for Engineering.[83] Minutes for this meeting state that the Board received a 48-page presentation, which included a slide titled "Acquisition Opportunities – Summary" that identified an "Active" potential transaction involving Bold as "Seller" and EnCap as "Financial Partner."[84] The meeting minutes, however, do not reflect any discussion concerning Bold specifically.[85] Rather, the minutes merely indicate that the Board discussed, as its third topic of discussion, "[c]orporate and asset acquisition opportunities."[86]

---

[81] Compl. ¶ 81; Proxy Statement at 47.

[82] Compl. ¶ 10.

[83] Compl. ¶ 82.

[84] Compl. ¶ 83 (citing ESTE000048).

[85] Compl. ¶ 84.

[86] *Id.* (citing ESTE000010).

**H. Earthstone-Bold Discussions Continue in May, June and July 2016**

Following the May 3, 2016 Board meeting, and throughout May, June and July, Earthstone's management, led by Lodzinski, continued discussions with EnCap and Bold. First, on May 11, 2016, Earthstone management delivered a non-binding presentation to EnCap concerning a possible Earthstone-Bold combination based on an equity valuation for Bold of approximately $305 million in shares of Earthstone common stock.[87] The presentation was silent with respect to the formation of an Earthstone special committee or the need for a majority of Earthstone's minority stockholders to approve the combination.[88]

On May 18, 2016, Earthstone management made a second presentation to EnCap.[89] This time, Earthstone revised its equity valuation for Bold to approximately $335 million in shares of Earthstone common stock to account for acreage that Bold recently acquired that had not been included in Earthstone's prior valuation of $305 million.[90] Here again, the presentation did not include any

---

[87] Compl. ¶ 86; Proxy Statement at 47.

[88] Compl. ¶ 87.

[89] Compl. ¶ 88; Proxy Statement at 47.

[90] Compl. ¶ 88; Proxy Statement at 47.

mention of an independent special committee or a majority of the minority stockholder vote.[91]

A flurry of activity followed in June and July 2016. On June 2, 2016, Anderson discussed Bold's assets with Bold's president, Joseph Castillo, and the two executives agreed to set up an in-person meeting.[92] The following day, Earthstone met with TPH to discuss the current asset and divestiture market for transactions in markets relevant to a possible Earthstone – Bold transaction.[93] Also on June 3, Thielemann sent an email to Lodzinski and Anderson providing "a suggested action plan to be carried out [over] the ensuing weeks and months, relating to a possible transaction between [Earthstone and Bold]."[94] On June 7, 2016, EnCap held a teleconference concerning the plan of action outlined in Thielemann's email.[95]

---

[91] Compl. ¶ 88.

[92] Compl. ¶ 90; Proxy Statement at 48.

[93] Compl. ¶ 90; Proxy Statement at 48.

[94] Compl. ¶ 90 (citing Proxy Statement at 48) (alteration in Compl.).

[95] Compl. ¶ 90; Proxy Statement at 48.

On June 10, 2016, Lodzinski and Anderson met with Castillo twice.[96] First, they met at Earthstone's office to discuss the possible combination.[97] Later that day, they met at EnCap's offices for a meeting with EnCap and TPH, during which TPH provided its views on the equity market's likely receptivity to a combination of Earthstone and Bold.[98] Subsequently, Anderson and Castillo corresponded by email on June 21, 2016, about arranging a meeting to begin a due diligence review that would include an overview of the assets of both companies and a tour of Bold's field facilities.[99] On June 28, 2016, Earthstone provided Bold with access to its corporate data room.[100] On July 6, 2016, Earthstone management, EnCap and EnCap's counsel met at EnCap's offices "to develop a preliminary timeline to complete a *possible* transaction, identify the participants and their counsel, and assign responsibilities to complete the proposed transaction."[101]

---

[96] Compl. ¶ 91; Proxy Statement at 48.

[97] Compl. ¶ 91.

[98] *Id.*

[99] Compl. ¶ 92.

[100] *Id.* In mid-June 2016, while discussions between Earthstone and EnCap concerning a potential Earthstone-Bold combination were ongoing, Earthstone conducted an unrelated stock offering following which Oak Valley's ownership stake in Earthstone was reduced from over 50% to 41.1%. Compl. ¶ 53; Stephens Presentation (Nov. 7, 2016) at ESTE000520. The Board and Earthstone's management team remained unchanged. Compl. ¶ 54.

[101] Compl. ¶ 93; Proxy Statement at 48 (emphasis supplied).

## I. Earthstone Forms a Special Committee

By July 8, 2016, Earthstone's independent directors, Urban and Joliat, had begun to take steps to form a special committee of the Board (of which they would be the only members).[102] Specifically, during the week following July 8, 2016, Joliat and Urban interviewed three law firms to serve as counsel to the Special Committee, and ultimately retained Richards, Layton, & Finger, P.A. ("RLF").[103] They also interviewed six investment banking firms before settling on Stephens, Inc. as the Special Committee's financial advisor.[104] The Board adopted the resolution to create the Special Committee on July 29, 2016.[105] Thereafter, between July and November 2016, the Special Committee formally met sixteen times.[106]

During a meeting of the Special Committee on July 22, 2016, Lodzinski and Anderson gave a presentation on the possible structure of a potential Earthstone-Bold combination and updated the Special Committee on the status of negotiations

---

[102] Compl. ¶¶ 99, 101; Proxy Statement at 48.

[103] Compl. ¶ 99; Proxy Statement at 48. In the midst of these interviews, Lodzinski met with Bold's Chief Financial Officer and Executive Vice President for Business Development to discuss, among other things, employment matters and the future composition of Earthstone's board of directors should Earthstone make a formal proposal. Compl. ¶ 100; Proxy Statement at 48. No specific plans were agreed upon, however. Proxy Statement at 48.

[104] Compl. ¶ 110; Proxy Statement at 49.

[105] Compl. ¶ 101; Proxy Statement at 49.

[106] Proxy Statement at 49–53.

that had occurred thus far.[107] Anderson discussed an updated valuation of Bold prepared by management reflecting a value of between $300 and $350 million.[108] Anderson also reported to the Special Committee that Bold did not have enough cash and drilling capacity to continue to run the company, even with its final capital call to EnCap.[109] Nevertheless, Anderson stated that he had been "advised" that EnCap "will continue funding Bold."[110] Lodzinski added that "he believes EnCap is looking to sell Bold because it is in EnCap's Fund 9 and EnCap has started its Fund 10, EnCap has reached its total capital commitment and EnCap does not think that the current management of Bold could take the Company public."[111]

According to the meeting minutes, "[i]t was agreed that the Special Committee will understand, oversee and direct the negotiations with respect to the Potential Transaction" and that "any major decisions to be made with respect to the negotiations should be made by the Special Committee."[112] The minutes also reflect

---

[107] Compl. ¶ 106 (citing ESTE000074–76).

[108] *Id.* (citing ESTE000074–76).

[109] Compl. ¶ 102 (citing ESTE000075); Special Committee Meeting Minutes (July 22, 2016) at ESTE000075.

[110] Compl. ¶ 102 (citing ESTE000075); Special Committee Meeting Minutes (July 22, 2016) at ESTE000075.

[111] Compl. ¶ 103 (quoting ESTE000075).

[112] Compl. ¶ 104 (quoting ESTE000075).

that the Special Committee emphasized "that any directors affiliated with EnCap would be kept out of the flow of information and any information regarding pricing or valuations should only be communicated to members of the Special Committee."[113]

As noted, the Board formally established the Special Committee on July 29, 2016, notwithstanding that it had already met on several occasions before then.[114] The Special Committee's charter authorized the Special Committee, among other things, to:

(i) Determine whether or not to make a formal offer of combination with Bold and if so, the terms and conditions of such offer;

(ii) Negotiate and oversee the documentation of any such offer;

(iii) Retain its own financial advisor and legal counsel;

(iv) Solicit the views of, and obtain information from, Earthstone's executive, financial and other officers; and

(v) Reject the potential transaction, cease further negotiations and "walk-away."[115]

---

[113] *Id.* (quoting ESTE000076).

[114] Compl. ¶ 101; Proxy Statement at 49.

[115] Proxy Statement at 49.

The Special Committee's charter also provided that the Board would not approve a transaction with Bold without a favorable recommendation from the Special Committee.[116]

## J. Stephens' Initial Financial Analysis and Recommendations

On August 16, 2016, Stephens offered its preliminary financial analysis to the Special Committee.[117] Stephens noted that its analysis was subject to "further due diligence on certain items including the Bold projections which were prepared by [Earthstone management],"[118] that it was unsure of the source of the information Earthstone management had used to prepare its Bold projections,[119] "that the Company's projections assume the number of shares to be issued in the deal will be calculated based on a 10% discount to the stock price," and that it was "not sure why such a discount would be used in this case."[120] The minutes of that meeting reflect "that the deal currently being contemplated by the Company includes an equity split of 60% for Bold and 40% for the Company."[121] The minutes also reflect that the

---

[116] *Id.*

[117] Compl. ¶ 112.

[118] *Id.* (quoting ESTE000227) (alteration in Compl.).

[119] *Id.* (citing ESTE000227).

[120] Compl. ¶ 114 (quoting ESTE000229).

[121] Compl. ¶ 113 (quoting ESTE000228–29).

"contribution analysis show[ed] that the average contribution is 37.2% for Bold and 62.4% for the Company," and did not, therefore, "support the currently proposed split between the Company and Bold."[122]

After discussing the details of its preliminary analysis, Stephens stepped back to offer its initial macro impressions of the Transaction from Earthstone's perspective. On this point, Stephens was clear; the Transaction was likely to be highly accretive to Earthstone. Specifically, Stephens advised the Special Committee that "[t]he Company's stock price is currently around $10.89 per share and assuming that the transaction is completed and based on public comparable transactions for the purchase of approximately 21,000 acres, Stephens estimate[d] that the stock price [would] increase to $26.46 per share."[123]

According to Stephens, "the biggest difference in the Company's valuation as compared to the Bold valuation relates to the fact that the Company is at a more mature stage in its development than Bold."[124] Therefore, according to Stephens, "the valuation of the Company shows that the Company may be slightly undervalued."[125]

---

[122] *Id.* (quoting ESTE000228–29).

[123] Compl. ¶ 144 (quoting ESTE000228).

[124] *Id.* (quoting ESTE000228).

[125] *Id.* (quoting ESTE000228).

Stephens' long-term view of the Transaction revealed greater value for Bold. Specifically, Stephens reported that if it "went out further than 2018 in the analysis, the contributions from Bold are expected to be significant and would change the analysis."[126] Stephens cautioned, however, that "sometimes using estimates that are further out could provide less meaningful results" and, therefore, it was not inclined to use the 2019 projections in its analysis.[127]

As of the August 16, 2016 meeting, the Special Committee had concluded that, because Earthstone was "at a more mature stage of development than Bold, and Bold currently does not have much by way of current cash flow, the contribution analysis based on 2017 and 2018 EBITDA did not support the proposed ownership split of 60% for Bold and 40% for the Company."[128] But this assessment was by no means dispositive of value given Stephens' view that "results of the contribution analysis [were] not as relevant when a mature company [was] buying acreage from a less mature company."[129]

---

[126] Compl. ¶ 139 (quoting ESTE000229).

[127] *Id.* (quoting ESTE000229).

[128] Compl. ¶ 140 (quoting ESTE000230).

[129] Compl. ¶ 141 (quoting ESTE000229) (alteration in Compl.).

On August 19, 2016, Stephens presented an updated preliminary valuation to the Special Committee that included two recent comparable transactions.[130] Stephens reported that, based on the updated analysis, "the ownership interest of the Company in the resulting entity [should be] around 38%–39%."[131] The Special Committee and Stephens then discussed "the best way to ensure that the Company is getting a good price."[132] Stephens noted that "the key is the number of shares that the Company issues in the transaction."[133] Stephens presented a revised valuation of Earthstone that "took out the 10% discount and used a 30 day volume weighted average price of $10.35," "result[ing] in 57% for Bold and 43% for the Company."[134]

> Following a discussion of Stephens' updated analyses, the Special Committee determined that the price of the Company's stock in the transaction should not be calculated at a discount, the volume weighted average trading price for the 30 days prior to signing should be used to determine the Company's stock price, the transaction should result in the Company owning more than 40% of the resulting entity and the $325 million purchase price should be based on the enterprise value of Bold, which includes liabilities.[135]

---

[130] Yoch Aff., Ex. 10 ("Special Committee Meeting Minutes (Aug. 19, 2016)") at ESTE000234.

[131] Special Committee Meeting Minutes (Aug. 19, 2016) at ESTE000234.

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] Compl. ¶ 115 (quoting ESTE000234–35); Special Committee Meeting Minutes (Aug. 19, 2016) at ESTE000234–35.

Having settled on these specifics, the Special Committee authorized Lodzinski to send a corresponding proposal to Bold.[136]

### K. The Special Committee Makes an Offer to Bold

On August 19, 2016, Lodzinski communicated Earthstone's first formal proposal to Bold in the form of an offer letter (the "Offer Letter") in which Earthstone proposed a transaction whereby Earthstone would combine with Bold in an all-stock transaction valuing Bold at $325 million, including the assumption of net financial obligations not to exceed $25 million.[137] According to the Offer Letter, the number of Earthstone shares to be issued would be calculated by dividing $325 million, less net financial obligations, by the greater of (i) Earthstone's volume-weighted average per share price for the twenty trading days preceding the date a definitive agreement is signed, or (ii) $10.50 per share.[138] "Assuming approximately $25 million in net financial obligations and a $10.50 share price, the offer letter contemplated Earthstone owning approximately 45% of the resulting

---

[136] Special Committee Meeting Minutes (Aug. 19, 2016) at ESTE000235.

[137] Bennett Aff., Ex. H ("Offer Letter") at 1; Compl. ¶ 118. The parties stipulated to the universe of Section 220 Documents, which did not include the Offer Letter. The Proxy Statement describes the Offer Letter, but it does not include a copy of the document.

[138] Offer Letter at 1 n.1; Compl. ¶ 118.

entity."[139] The Offer Letter expressly conditioned consummation of the Transaction on "final approval by Earthstone's Special Committee" *and* "formal approval of Earthstone's stockholders, including the holders of a majority of the common stock held by persons other than EnCap Investments LP and its affiliates and associates, and [sic] well as the Board of Managers of Bold and the LLC interest owners of Bold (if required)."[140]

Lodzinski continued to serve as Earthstone's lead negotiator following delivery of the Offer Letter.[141] On August 31, 2016, Castillo sent Bold's counterproposal to Lodzinski wherein Bold proposed that it would own 62.5% of the combined entity.[142]

On September 1 and 6, 2016, the Special Committee met with RLF, Stephens and members of management to consider Bold's counterproposal.[143] Meeting minutes from September 6, 2016 reflect that Stephens advised, "based on the

---

[139] Compl. ¶ 118. *See also* Proxy Statement at 50.

[140] Offer Letter at 1.

[141] Compl. ¶ 120.

[142] Proxy Statement at 50. The Complaint erroneously identifies Bold's counterproposal as calling for Bold to own 65.5% of the combined entity. Compl. ¶ 120.

[143] Compl. ¶ 121.

updated valuation, the Company should try to end up at approximately 40%."[144] "The members of the Committee then advised that they would like the ownership split to be 40% or more for the Company,"[145] "authorized Lodzinski to prepare a draft response to Bold's counteroffer and noted that such response should provide for an ownership percentage of approximately 40% for the Company."[146] On September 8, 2016, Lodzinski submitted a counteroffer in writing to Castillo that provided for Bold to receive 60% ownership (in the form of 34.593 million shares of Earthstone common stock) in the combined company.[147]

In response, on September 9, 2016, Castillo reiterated his position that Bold should have 62.5% ownership of the combined company.[148] During a phone conversation on September 12, 2016, Lodzinski advised Castillo that Earthstone might be able to increase its offer from 34.593 million shares to 35.5 million shares of Earthstone common stock, which would increase Bold's projected ownership interest in the combined entity to more than 61.5%.[149] Castillo agreed to consider

---

[144] *Id.*; Bennett Aff., Ex. F ("Special Committee Meeting Minutes (Sept. 6, 2016)") at ESTE000240.

[145] Compl. ¶ 121; Special Committee Meeting Minutes (Sept. 6, 2016) at ESTE000240.

[146] Special Committee Meeting Minutes (Sept. 6, 2016) at ESTE000241.

[147] Compl. ¶ 121.

[148] Compl. ¶ 123; Proxy Statement at 51.

[149] Compl. ¶ 123.

30

that allocation and Lodzinski stated he would seek further direction from the Special Committee.[150]

The Special Committee met again with RLF and Stephens on September 13, 2016.[151] Joliat reported on his conversation with Lodzinski, noting that: "Company management believed that, because the valuation is premised on a $10.50 stock price and the Company's stock is currently trading around $9, the Company could accept a transaction that provides for slightly less than a 40% ownership interest for the Company."[152] Notwithstanding management's views, Stephens reiterated its advice that "the Company should attempt to negotiate for a transaction that results in an ownership percentage of at least 40% for the Company."[153] Having said that, Stephens emphasized that the ownership split

> was not the only metric of fairness and that the appropriate ownership split could change over time and will be a moving target until closing. Because of that, [Mr. North (the Stephens advisor)] cannot advise on Stephens' ability to provide a fairness opinion because it will be based on an analysis at the time the transaction closes and will be subject to the decision of Stephens' opinion committee. However, he noted that,

---

[150] *Id.*

[151] Compl. ¶ 124; Bennett Aff., Ex. G ("Special Committee Meeting Minutes (Sept. 13, 2016)") at ESTE000246.

[152] Compl. ¶ 124 (quoting ESTE000247); Special Committee Meeting Minutes (Sept. 13, 2016) at ESTE000247.

[153] Compl. ¶ 125 (quoting ESTE000246); Special Committee Meeting Minutes (Sept. 13, 2016) at ESTE000246.

at this time, he is comfortable with a fairness analysis with respect to an ownership percentage for the Company at approximately 40%.[154]

Stephens refined that statement later in the meeting when it "noted that, while there is [an] argument that the Company's stock price is currently undervalued (and therefore worth more than $9 per share), [Stephens] believes that [it] would be able to provide a fairness opinion if the Company's ownership percentage is slightly below 40%."[155] Following further discussion, "the members of the Committee agreed that Mr. Joliat should inform Mr. Lodzinski that the Committee would like to keep the Company's ownership percentage at approximately 40%."[156]

On September 19, 2016, following an email exchange, Lodzinski and Castillo agreed that each would present to the Special Committee and EnCap, respectively, a transaction whereby Bold would receive 36.0 million shares of Earthstone common stock, or 61% of the combined company.[157] Lodzinski also agreed to seek authority from the Special Committee to increase the offer to 36.5 million shares of Earthstone

---

[154] Compl. ¶ 125; Special Committee Meeting Minutes (Sept. 13, 2016) at ESTE000246. To be sure, Stephens remained consistent in its view that a contribution analysis was not the best indicator of fairness and that "the key analysis with respect to this transaction is the relative equity analysis," which supported the Transaction as brokered. Compl. ¶ 158 (quoting ESTE000229); Stephens Presentation (Nov. 7, 2016) at ESTE000557.

[155] Compl. ¶ 160; Special Committee Meeting Minutes (Sept. 13, 2016) at ESTE000247.

[156] Compl. ¶ 125; Special Committee Meeting Minutes (Sept. 13, 2016) at ESTE000247.

[157] Compl. ¶ 127; Proxy Statement at 51.

common stock, or 61.3% of the combined company, if necessary to reach a final agreement.[158]

Lodzinski informed the Special Committee of his September 19 exchange with Castillo on September 23, 2016.[159] According to Plaintiff, Lodzinski "advised that the negotiations are continuing but it appears that the parties have agreed on a transaction involving the purchase of Bold for 36 million shares, which represents a 61% interest in the surviving entity for Bold."[160] Lodzinski "further advised that he would like authority from the Committee to increase the purchase price to 36.5 million shares which represents a 61.3% interest in the surviving entity for Bold to allow him to obtain some more favorable terms for the Company in the merger agreement and in other related negotiations with Bold."[161] It is alleged that after a discussion lasting only twenty-six minutes, the Special Committee authorized Lodzinski to finalize negotiations with Bold for up to 36.5 million shares.[162]

---

[158] Compl. ¶ 127; Proxy Statement at 51.

[159] Compl. ¶ 128; Proxy Statement at 52.

[160] Compl. ¶ 128 (quoting ESTE000262).

[161] *Id.* (quoting ESTE000262).

[162] Compl. ¶ 128.

## L. The Special Committee Recommends the Transaction

By November 7, 2016, Earthstone and Bold had reached an agreement regarding the Transaction structure and, later that day, the Special Committee met and voted to recommend the proposed Transaction, including the contribution analysis and ancillary agreements.[163] Lodzinski, Anderson and Singleton participated in the first part of the meeting but then departed, leaving Joliat, Urban, Stephens and RLF to consider whether to recommend the Transaction to the Board.[164] Stephens delivered its fairness opinion, which rested, in part, upon the 2019 projections even though it had earlier opined that a contribution analysis that incorporated these projections "could provide less meaningful results."[165]

The Transaction contemplated that Earthstone would conduct its business through a newly-formed Delaware limited liability company and wholly-owned subsidiary of Earthstone, Earthstone Energy Holdings, LLC ("EEH"), and that Earthstone would be EEH's sole managing member.[166] The deal was structured as an "Up-C" combination in which Earthstone and Bold (through Bold Holdings),

---

[163] Compl. ¶¶ 131–32, 134; Proxy Statement at 53.

[164] Compl. ¶ 132; Proxy Statement at 53.

[165] Compl. ¶ 142 (citing ESTE000229).

[166] Compl. ¶ 131.

34

each contributed their assets to EEH.[167]  Existing Earthstone stockholders and Bold Holdings ultimately would own approximately 39% and 61% of the combined company's (Earthstone) Class A common stock, respectively.[168]

## M. The Earthstone Board Approves and Announces the Transaction

The Board met and approved the Transaction on November 7, 2016, soon after the Special Committee meeting adjourned.[169]  Earthstone and Bold announced the Transaction the next day.[170]  The market's reaction to the announcement was highly favorable.  Earthstone's stock price rose 27% on the day of the announcement.[171]  Between November 7, 2016 and April 7, 2017, the stock price increased from $8.98 to $14.98 per share.[172]

---

[167] *Id.*; Proxy Statement at 2, 53.

[168] Compl. ¶ 131; Proxy Statement at 45.

[169] Compl. ¶ 135.

[170] Compl. ¶ 22.

[171] Bennett Aff., Ex. I (Stock Price Chart) at 2.  The Court may take judicial notice of Earthstone's stock price.  *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 169 ("The trial court may also take judicial notice of matters that are not subject to reasonable dispute.").

[172] Compl. ¶ 143.

## N. Earthstone's Disinterested Stockholders Approve the Transaction

On May 9, 2017, Earthstone's disinterested stockholders voted to approve the Transaction.[173] Of Earthstone's outstanding shares of common stock as of the record date, 83.6% of those shares participated in the vote.[174] Of the voted shares not held by Oak Valley or the Company's executive officers, 99.7% voted in favor of the Transaction.[175]

In its explanation of the Board's reasons for recommending the Transaction, the Proxy Statement disclosed "Bold has a valuable and highly prospective asset base," including acreage in an area currently "of intense industry interest."[176] The Board also opined that the Transaction "will result in significantly enhancing [Earthstone's] financial position, production, Midland Basin acreage position and drilling locations" and will "provide long-term strategic benefit to [Earthstone] stockholders by creating an oil and natural gas company with more diversified reserves and increased scope and scale of economies."[177]

---

[173] Earthstone Energy, Inc., Current Report (Form 8-K) (May 15, 2017) at Item 5.07.

[174] *Id.*

[175] *Id.* The Court may take judicial notice of a stockholder vote approving a transaction where there exists no reasonable dispute as to whether stockholder approval occurred. *General Motors (Hughes) S'holder Litig.*, 897 A.2d at 170–71.

[176] Proxy Statement at 54.

[177] Proxy Statement at 54–55.

## O. Procedural Posture

Plaintiff filed his first complaint on June 2, 2017. In response to motions to dismiss, Plaintiff amended his complaint on August 13, 2017, with the now-operative Complaint.[178] Defendants renewed their motions to dismiss on November 8, 2017.[179]

The Complaint sets forth five direct and derivative claims: Counts I through III assert breach of fiduciary duty claims against the Director Defendants, Lodzinski and Singleton as officers of Earthstone, and EnCap and Oak Valley as Earthstone's controlling stockholders.[180] Count IV alleges Bold aided and abetted EnCap, Oak Valley and the Director Defendants' breaches of fiduciary duty.[181] And Count V alleges EnCap and Oak Valley aided and abetted the Director Defendants' breaches of fiduciary duty.[182]

Plaintiff's core contention is that Lodzinski caused the Special Committee and the Board to approve the Transaction for the benefit of himself, EnCap and Oak Valley (to save their failing investment in Bold) and to the detriment of Earthstone

---

[178] Dkts. 1, 17–21, 37.

[179] Dkts. 40–47.

[180] Compl. ¶¶ 189–203.

[181] Compl. ¶¶ 204–08.

[182] Compl. ¶¶ 209–13.

stockholders. In doing so, Lodzinski, Singleton and the Director Defendants breached their fiduciary duties as officers and directors of Earthstone, and EnCap and Oak Valley breached their fiduciary duties as Earthstone's controlling stockholder. Bold, EnCap and Oak Valley (if not Earthstone's controlling stockholders) are alleged to have aided and abetted the fiduciary breaches.

The motions to dismiss invoke both Court of Chancery Rules 12(b)(6) and 23.1. For reasons explained below, I am satisfied that the standard of review applicable to Plaintiff's fiduciary duty claims is the business judgment rule and that Plaintiff has not pled facts that overcome the presumptions of reasonable and informed decision-making that are features of that standard. Because I have concluded that the Complaint fails to state viable claims, I need not reach Defendants' argument that Plaintiff has failed adequately to plead demand futility.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the Plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts pled in the complaint.[183] In considering a motion to dismiss, the Court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in

---

[183] *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

Plaintiff's favor.[184]  The Court need not accept, however, conclusory allegations that lack factual support or "accept every strained interpretation of the allegations proposed by the plaintiff."[185]

## A. The Standard of Review

The battle lines drawn by the parties mark familiar territory.  According to Plaintiff, the Transaction involves a controlling stockholder (Oak Valley and, by extension, EnCap) who stood on both sides of the deal.  Thus, the Individual Defendants' fiduciary breaches cannot be "cleansed" by an informed, uncoerced vote of the Earthstone stockholders approving the Transaction.[186]  In other words, as Plaintiff sees the case, because the Transaction involved a conflicted controlling stockholder, *Corwin* does not apply.[187]  As a fall back, Plaintiff maintains that, even if implicated, *Corwin* does not apply because the Earthstone stockholder vote was uninformed as a consequence of material omissions in the Proxy Statement.

---

[184] *Id.*

[185] *Id.*

[186] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 309 (Del. 2015) (holding that the business judgment rule applies to "cleanse" alleged breaches of fiduciary duty when disinterested stockholders have approved the challenged transaction by an informed, uncoerced vote).

[187] *See* Pl.'s Omnibus Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Answering Br.") 4–5.  *See also In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *6 n.28 (Del. Ch. Jan. 5, 2017) (holding that "the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder") (citing *Larkin v. Shah*, 2016 WL 4485447, at *10 (Del. Ch. Aug. 25, 2016)).

Defendants forcefully dispute the fundamental premise of Plaintiff's argument. According to Defendants, with only a 41.1% ownership stake, Oak Valley is far from Earthstone's controlling stockholder. *Corwin,* therefore, provides the relevant analytical paradigm and sets the standard of review as the business judgment rule. For their fall back, Defendants argue that even if the Court deems Oak Valley to be a controlling stockholder, the business judgment rule still applies because the Transaction was structured so that it would comply with the six conditions set forth in *Kahn v. M & F Worldwide Corp.* ("*MFW*").[188] Plaintiff, of course, counters that *MFW* has no application here because the Special Committee was neither well-functioning nor independent, the vote of the minority stockholders was not informed and none of the protective deal conditions was imposed *ab initio* as required.[189] Accordingly, Plaintiff asserts that regardless of whether one views the Transaction through a *Corwin* or *MFW* lens, the image is the same—entire fairness review.[190]

---

[188] *MFW*, 88 A.3d at 639 (setting forth six factors that would justify business judgment review of a controlling stockholder transaction, including *ab initio* conditions that the transaction be negotiated and approved by a well-functioning special committee of independent directors and then approved again by an informed, uncoerced vote of a majority of the minority stockholders).

[189] Answering Br. 4.

[190] *Id.* 3.

The parties to the Transaction evidently anticipated that a dissatisfied stockholder might challenge the Transaction post-closing and, thus, structured the Transaction with the *MFW* framework in mind.[191]  "[T]he *MFW* standard was born with the goal of establishing a technique, a practice, a structure, where, at the pleading stage, defendants could show that they were not subject to a breach of fiduciary duty challenge."[192]  Because I am satisfied that Earthstone's decision to employ the *MFW* framework was well-executed by all concerned, I need not decide whether *vel non* Oak Valley was Earthstone's controlling stockholder because, even if it was, business judgment deference is the appropriate standard by which to evaluate the Transaction, even at the pleadings stage.[193]

---

[191] This, of course, is the cynical explanation.  The other quite plausible explanation is that the Board, with the guidance of competent counsel, elected to practice good corporate governance.

[192] *Swomley v. Schlecht*, C.A. No. 9355–VCL, at 67 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE). *See also IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *21 (Del. Ch. Dec. 11, 2017) (applying business judgment review at the pleadings stage to grant a motion to dismiss where plaintiff "failed to plead facts sufficient to call into question satisfaction of any of the six elements set forth in the *MFW* framework"); *In re Synutra Int'l, Inc.*, 2018 WL 705702 (Del. Ch. Feb. 2, 2018) (ORDER) (same); *In re Books-A-Million*, 2016 WL 5874974 (Del. Ch. Oct. 10, 2016) (same), *aff'd*, 164 A.3d 56 (Del. 2017); *Swomley*, C.A. No. 9355–VCL (same).

[193] *IRA Tr. FBO Bobbie Ahmed*, 2017 WL 7053964, at *10 (observing that the *MFW* framework applies beyond the controller squeeze-out transactional context to any form of conflicted controller transaction) (citation omitted).

The six elements set forth in *MFW* that must be satisfied to earn business judgment review are:

(i)     the controller must condition the procession of the transaction *ab initio* on the approval of both a special committee and a majority of the minority stockholders;

(ii)    the special committee must be independent;

(iii)   the special committee must be empowered to freely select its own advisors and to say no definitively;

(iv)    the special committee must meet its duty of care in negotiating a fair price;

(v)     the vote of the minority must be informed; and

(vi)    there can be no coercion of the minority.[194]

As best I can discern, Plaintiff offers four reasons why the Transaction failed to meet the *MFW* elements: (1) the *ab initio* requirement was not satisfied because deal negotiations had commenced prior to the announcement of the Special Committee and majority of the minority vote conditions; (2) the Special Committee was not independent because its members had ties to Oak Valley, EnCap and Lodzinski; (3) the Special Committee did not act with due care because it allowed Lodzinski to control all aspects of the negotiation and review process without supervision prior to bringing the deal to the Board for approval; and (4) the minority stockholder vote

---

[194] *MFW*, 88 A.3d at 645.

was not fully informed because there were material deficiencies in the Proxy Statement. I address each argument in turn.

## B. The *Ab Initio* Condition Was Satisfied

When a proposed transaction is conditioned on approval of both a special committee of independent directors and an informed majority of the disinterested stockholders, this deal structure "replicates the arm's-length merger steps of the DGCL by 'requir[ing] two independent approvals, which it is fair to say serve independent integrity-enforcing functions.'"[195] In order truly to mimic arms-length dealing, and to neutralize the controller's influence, these two conditions must be in place "*ab initio*,"[196] meaning the conditions must be announced "before any negotiations [take] place."[197] And, for purposes of the *MFW* analysis, in most instances, "negotiations" begin when a proposal is made by one party which, if accepted by the counter-party, would constitute an agreement between the parties regarding the contemplated transaction.[198] "Using this point in time fulfills the goals

---

[195] *Id.* at 643 (citing *In re MFW S'holders Litig.*, 67 A.3d 496, 528 (Del. Ch. 2013), *aff'd sub nom. MFW*, 88 A.3d 635).

[196] *MFW S'holders Litig.*, 67 A.3d at 528.

[197] *Synutra Int'l*, 2018 WL 705702, at *2 (citing *Swomley*, 2014 WL 4470947, at *21).

[198] *See Synutra Int'l*, 2018 WL 705702, at *2–3 (analyzing the initial offer letter and follow up offer letter for purposes of the *ab initio* inquiry); *Books-A-Million*, 2016 WL 5874974, at *8 (finding the offer letter conditioning the transaction on special committee approval and informed vote of the majority of the minority satisfied the *ab initio* requirement).

of disabling the controller for purposes of the negotiations and ensuring that the controller 'cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move.'"[199]

Here, the Offer Letter, sent on August 19, 2016, was the very first proposal that Earthstone directed to Bold.[200] The Offer Letter announced and made clear from

*See also id.* (observing that the offer letter was a distinct proposal and that "it generated a separate process").

[199] *Synutra Int'l*, 2018 WL 705702, at *2 (citing *MFW*, 88 A.3d at 644). Plaintiff's concern that a controller could negotiate the material terms of a transaction before submitting a formal offer, and then claim *ab initio* status by sweeping those terms, along with the *MFW* conditions, into its first (and final) formal proposal, might well be justified on a different record. But that is not what happened here. As explained below, the Special Committee met several times to formulate its proposal before the Offer Letter was submitted. After the Offer Letter was delivered, in which the Special Committee clearly announced the *MFW* conditions, the Special Committee and Bold engaged in substantial negotiations before reaching a final agreement. Proxy Statement at 50–54.

[200] Plaintiff's argument that the Court cannot rely on the Offer Letter without converting this motion to dismiss into a motion for summary judgment is without merit. Answering Br. 4 n.2. It is unfortunate that the Offer Letter was not included with the Section 220 Documents. Nevertheless, there is no doubt the Offer Letter is integral to the Complaint; indeed, the pleading expressly relies upon the Offer Letter (albeit selectively) at paragraph 118. Compl. ¶ 118. In this regard, Plaintiff asserts paragraph 118 "is a reference to the Proxy, which merely states that a letter was sent on August 19." Answering Br. 20. This argument falls short, however, because paragraph 118 does not reference the Proxy Statement directly (or quote it) nor does it allege *only* that a letter was sent on August 19. Because I am satisfied that the Offer Letter is integral to the Complaint and paragraph 118 only selectively describes the Offer Letter, the Court may consider it to decide this motion to dismiss. *See Wal-Mart Stores, Inc.,* 860 A.2d at 320 (noting that on a motion to dismiss, the Court may consider documents that are "integral" to the complaint); *Reiter v. Fairbank*, 2016 WL 6081823, at *5 (Del. Ch. Oct. 18, 2016) ("[W]here a complaint quotes or characterizes some parts of a document but omits other parts of the same document, the

the outset—at the start of negotiations on the proposal—that any transaction between Earthstone and Bold would be conditioned on "final approval by Earthstone's Special Committee" and "formal approval of Earthstone's stockholders, including the holders of a majority of the common stock held by persons other than EnCap Investments LP and its affiliates and associates, and [sic] well as the Board of Managers of Bold and the LLC interest owners of Bold (if required)."[201] By conditioning the first offer in this manner, the Special Committee made clear to Bold and EnCap that the "procession of the transaction" would be subject to these terms.[202] That is precisely what *MFW* requires.[203]

Plaintiff argues that this construction of the time at which "negotiations" begin for *MFW* purposes ignores the substantial preliminary discussions that Lodzinski had with EnCap and Bold prior to the Offer Letter, and the opportunities afforded to the controller during those discussions to influence the outcome.[204] This argument, however, ignores the important distinction between "discussions" about the

---

Court may apply the incorporation-by-reference doctrine to guard against the cherry-picking of words in the document out of context.").

[201] Offer Letter at 1.

[202] *MFW*, 88 A.3d at 645.

[203] *Id.*

[204] Answering Br. 43–46.

possibility of a deal and "negotiations" of a proposed transaction after the "discussions" lead to a definitive proposal. As our Supreme Court has recognized:

> No dictionary references are needed to know that to "negotiate" means to bargain toward a desired contractual end, whereas to "discuss" means merely to exchange thoughts and points of views on matters of mutual interest, with no bargaining overtones necessarily involved.[205]

Lodzinski's discussions with EnCap and Bold, while extensive, never rose to the level of bargaining; they were entirely exploratory in nature. The Offer Letter marked the first real move in the negotiating bout.[206] It was followed by more than two months of negotiations between the Special Committee and Bold that included several attacks, parries and remises before a final deal was struck.[207] Given this history, the Offer Letter marked the appropriate time at which to announce the *MFW ab initio* conditions.

---

[205] *Colonial Sch. Bd. v. Colonial Affiliate, NCCEA/DSEA/NEA*, 449 A.2d 243, 247 (Del. 1982).

[206] Plaintiff's concern that a controller could negotiate the material terms of a transaction before submitting a formal offer, and then claim *ab initio* status by sweeping those terms, along with the *MFW* conditions, into its first (and final) formal proposal, might well be justified on a different record. But that is not what happened here. The Special Committee met several times to formulate its proposal before the Offer Letter was submitted. After the Offer Letter was delivered, in which the Special Committee clearly announced the *MFW* conditions, the Special Committee and Bold engaged in substantial negotiations before reaching a final agreement. Proxy Statement at 50–54.

[207] Compl. ¶¶ 120–21.

## C. The Special Committee Was Well-Functioning

The second, third and fourth *MFW* conditions, in essence, require that a special committee function well in order to justify business judgment deference.[208] Stated differently, "the special committee must function in a manner which indicates that the controlling stockholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arms-length."[209] The telltale signs of a well-functioning special committee—independence, full and unfettered negotiating authority and careful deliberation—are all present here.

### 1. The Special Committee Was Independent

"To establish lack of independence, [Plaintiff] must show that the directors are beholden to [EnCap or Oak Valley] or so under their influence that their discretion would be sterilized."[210] Moreover, "[a] plaintiff seeking to show that a director was not independent must satisfy a materiality standard. The court must conclude that the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties."[211] "In other words, [plaintiff must

---

[208] *MFW*, 88 A.3d at 645.

[209] *Id.* at 646 (internal quotations omitted).

[210] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (internal quotations omitted).

[211] *MFW*, 88 A.3d at 649.

abide by] a key teaching of our Supreme Court, requiring a showing that a specific director's independence is compromised by factors material to her."[212]

Plaintiff's showcase arguments regarding Urban and Joliat's compromised independence are: (1) EnCap appointed Urban and Joliat to their Earthstone board seats[213]; (2) both directors "own interests in Oak Valley," "which pre-date their Earthstone directorships"[214]; and (3) Urban is CEO of Vlasic Group, which has invested in Lodzinski-led companies.[215] None of these facts disabled either Urban or Joliat from proper service on (or to) the Special Committee.

First, "a director's nomination or election [to the board] by an interested party," standing alone, does not support a reasonable inference that the director lacks independence.[216] In *Ezcorp*, this court observed:

> [I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance

---

[212] *Id.* at 650.

[213] Compl. ¶ 96; Answering Br. 48.

[214] Compl. ¶¶ 96, 98; Answering Br. 48.

[215] Compl. ¶ 97; Answering Br. 49.

[216] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *40 (Del. Ch. Jan. 25, 2016) (decided in the demand futility context).

of one's duties, not the method of election, that generally touches on independence.[217]

Here, Plaintiff's allegation that EnCap appointed Urban and Joliat to the Earthstone board is insufficient to impeach their independence.

Second, Plaintiff's allegations regarding Urban and Joliat's "interests in Oak Valley" are likewise insufficient to allow a reasonable inference that both directors cannot act independently of Oak Valley as fiduciaries of Earthstone. Allegations of financial ties between the interested party and the director, without more, are not disqualifying.[218] Rather, Plaintiff must "compare the actual economic circumstances of the directors they challenge to the ties the plaintiff contends affect their impartiality."[219] The Complaint, however, does nothing more than baldly allege that Urban and Joliat's non-controlling membership interests in Oak Valley "fostered a long-running relationship with Lodzinski [] and EnCap," and therefore, Urban and Joliat's economic interests in Oak Valley depend on the leadership and financial backing of Lodzinski and EnCap.[220] Of course, the Complaint does not even attempt to allege the materiality to Urban and Joliat of their Oak Valley membership interests

---

[217] *Ezcorp*, 2016 WL 301245, at *40 (citing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[218] *MFW*, 88 A.3d at 650.

[219] *Id.*

[220] Compl. ¶ 96.

(or their Earthstone board seats).[221] That missing link separates the "financial ties" allegations from well-pled bases to infer compromised independence.

Third, Plaintiff's contention that Urban lacks independence "due to his role as CEO of Vlasic Group, which has invested in five different Lodzinski-led companies since 1988" misses the mark for the same reason that his other attacks on Urban's independence fail—the allegation, even if true, is not compromising.[222] According to Plaintiff, Urban's ties to Vlasic Group, which has ties (however attenuated) to Lodzinski, makes it "reasonably conceivable that Urban wishes to maintain a good relationship with Lodzinski and therefore lacks independence."[223] Allegations that directors "moved in the same social circles," "developed business relationships before joining the board" or described each other as "friends," are insufficient, without more, to rebut the presumption of independence.[224] Indeed,

> [a] lack of independence does not turn on whether the interested party can directly fire a director from his day job. It turns on, at the pleadings stage, whether the plaintiff[] [has] pled facts from which the director's

---

[221] Even if the Complaint alleged Urban and Joliat were motivated to preserve their compensation as Earthstone directors (which it does not), ordinary director compensation, "standing alone, cannot be the basis for asserting a lack of independence." *Synutra Int'l*, 2018 WL 705702, at *4 (citing *Robotti & Co., LLC v. Liddtell*, 2010 WL 157474, at *14 (Del. Ch. Jan. 14, 2010)).

[222] Compl. ¶ 97; Answering Br. 49.

[223] Compl. ¶ 97; Answering Br. 49.

[224] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004); *MFW*, 88 A.3d at 649.

50

ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.[225]

Here, there are no well-pled facts that allow an inference that Urban might feel subject to Lodzinski's domination (if any) because Vlasic Group made investments (of unspecified size), spanning nearly three decades, in five Lodzinski-led entities.

Plaintiff has not well-pled that the Special Committee members lacked independence.

## 2. The Special Committee Was Empowered

*MFW* instructs that a special committee is empowered if it can "freely select its own advisors and [can] say no definitively."[226] Plaintiff does not meaningfully argue that the Special Committee's mandate did not meet this test, and for good reason. The Board resolution creating the Special Committee expressly empowered the committee to hire its own legal and financial advisors, which is precisely what the Special Committee did after interviewing numerous potential candidates for the positions. The mandate also expressly empowered the Special Committee to "[r]eject the potential transaction, cease further negotiations and 'walk-away.'"[227]

---

[225] *Ezcorp*, 2016 WL 301245, at *36 (citing *Delaware Cnty. Emp. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015)).

[226] *MFW*, 88 A.3d at 645.

[227] Proxy Statement at 49.

Plaintiff has not well-pled that the Special Committee lacked the authority to negotiate the Transaction.

### 3. The Special Committee Acted with Due Care

*MFW* requires that "[t]he Special Committee meet[] its duty of care in negotiating a fair price."[228] "Due care in the decision making context is *process* due care only."[229] "For purposes of applying the [*MFW*] framework on a motion to dismiss, the standard of review for measuring compliance with the duty of care is whether the complaint has alleged facts supporting a reasonably conceivable inference that the directors were grossly negligent."[230] "In the civil context, the Delaware Supreme Court has defined gross negligence as 'a higher level of negligence representing an extreme departure from the ordinary standard of care.'"[231] "It refers to a decision 'so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion.'"[232]

---

[228] *MFW*, 88 A.3d at 645.

[229] *Synutra Int'l*, 2018 WL 705702, at *4 (emphasis in original) (citing *Brehm*, 746 A.2d at 264). "Process due care" means that directors must "inform themselves, prior to making a business decision, of all material information reasonably available to them." *Aronson*, 473 A.2d at 812. *See also Synutra Int'l*, 2018 WL 705702, at *4.

[230] *Books-A-Million*, 2016 WL 5874974, at *17.

[231] *Synutra Int'l*, 2018 WL 705702, at *5 (citing *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1999)).

[232] *Synutra Int'l*, 2018 WL 705702, at *5 (citing *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988)).

"[G]ross negligence is a very tough standard to satisfy."[233] For example, "[r]aising questions such as 'whether the special committee could have extracted another higher bid' or 'whether the special committee was too conservative in valuing [the company's] future prospects' does not plead a violation of the duty of care."[234] Likewise, allegations that the Special Committee could have approached the negotiations differently implicate matters of strategy and tactics, not a duty of care violation.[235] Simply stated, "[a] committee [will] satisfy its duty of care by negotiating diligently with the assistance of advisors."[236] That is the only reasonable inference of what happened here.

Plaintiff maintains that the Special Committee failed to act with due care in three respects: "the Special Committee failed to exercise real bargaining power, permitted the Transaction process to be dominated by conflicted Earthstone management and EnCap, and capitulated to the terms of the Transaction that Lodzinski and EnCap favored and had been negotiating for months."[237] These

---

[233] *Swomley*, C.A. No. 9355–VCL, at 73.

[234] *Synutra Int'l*, 2018 WL 705702, at *5 (citing *MFW*, 67 A.3d at 516).

[235] *Swomley*, C.A. No. 9355–VCL, at 73–74 ("Somebody could have negotiated that differently, but that seems to me to be a matter of strategy and tactics that's debatable and isn't a duty of care violation.").

[236] *Books-A-Million*, 2016 WL 5874974, at *18 (citing *MFW S'holders Litig.*, 67 A.3d at 514–16).

[237] Compl. ¶ 13.

allegations, when measured against the backdrop of the properly considered record and the high legal threshold Plaintiff must clear, fail to state a viable gross negligence claim.

The *MFW* special committee met eight times.[238] The *Swomley* special committee met twenty times over eight months.[239] During a period of four months between its formation in July and the inking of the Transaction in November, the Earthstone Special Committee met sixteen times. At these meetings, the Special Committee actively engaged with its indisputably independent legal and financial advisors and considered their advice. Stephens prepared a preliminary financial analysis in August 2016, which the Special Committee evaluated.[240] That preliminary financial analysis advised the Special Committee that (1) "the contribution analysis does not support the currently proposed split between the Company and Bold"[241]; "the biggest difference in the Company's valuation as compared to the Bold valuation relates to the fact that the Company is at a more

---

[238] *MFW*, 88 A.3d at 651.

[239] *Swomley*, C.A. No. 9355–VCL, at 19.

[240] Compl. ¶ 112.

[241] Compl. ¶ 139 (quoting ESTE000228–29).

mature stage in its development than Bold"[242]; and that "the valuation of the Company shows that the Company may be slightly undervalued."[243]

Stephens advised that if it "went out further than 2018 in the analysis, the contributions from Bold are expected to be significant and would change the analysis."[244] This view made sense given that Earthstone was mature and fully functioning while Bold had not yet exploited its vast oil and gas properties in the Greater Permian Basin, including sought-after acreage in the Midland Basin.[245] Indeed, the real benefit of the Transaction to Earthstone—the deal thesis from the outset of the process—was that Bold had untapped resources to which Earthstone could deploy its upstream development capabilities.[246]

A few days after presenting its preliminary analysis to the Special Committee, Stephens updated the analysis to include recent transactions in the industry that were discussed at a previous Special Committee meeting. Stephens then advised the Special Committee that the key to "ensur[ing] that the Company is getting a good

---

[242] Compl. ¶ 144 (quoting ESTE000228).

[243] *Id.* (quoting ESTE000228).

[244] Compl. ¶ 139 (quoting ESTE000229).

[245] Proxy Statement at 22 (comparing estimates of developed and undeveloped reserves for each of Earthstone and Bold's oil, natural gas and natural gas liquids reserves).

[246] *Id.*; Compl. ¶ 18 ("Bold, meanwhile, will receive the capital it needs to fund ongoing operations and use Earthstone's established cash flows to grow its undeveloped assets . . .").

price . . . is the number of shares that the Company issues in the transaction." [247] With that insight, the Special Committee instructed Stephens to conduct its analysis without a 10% discount to Earthstone's stock price that was embedded in the management projections upon which Stephens' preliminary analysis relied.[248] The Special Committee also specified that Stephens should use "a 30 day volume weighted average price of $10.35" in its analysis.[249] The Offer Letter ultimately reflected these elements and other aspects of the Special Committee's work with Stephens to reach an appropriate valuation.

As noted, following the Offer Letter, the Special Committee, with the guidance of its advisors, engaged in several rounds of negotiations with Bold.[250] When a potential final agreement was in sight, Lodzinski was dispatched to broker final terms with Castillo, and then to bring those terms back to the Special Committee for approval. That is precisely what he did.[251]

---

[247] Special Committee Meeting Minutes (Aug. 19, 2016) at ESTE000234.

[248] *Id.*

[249] Compl. ¶ 114 (quoting ESTE000229); Special Committee Meeting Minutes (Aug. 19, 2016) at ESTE000234.

[250] Compl. ¶¶ 120–21.

[251] Compl. ¶ 127; Proxy Statement at 51.

Contrary to Plaintiff's assertions, the Special Committee did not rubber-stamp a fully-baked deal that Lodzinski had negotiated.[252] While Lodzinski did engage directly with Bold and EnCap, it can hardly be viewed as remarkable that a chairman and CEO with Lodzinski's proven track record and expertise in the oil and gas industry would have exploratory discussions with a potential merger partner before the formation of the Special Committee and then spearhead negotiations of the merger on behalf of the Special Committee after it was formed.[253] Indeed, in contrast to Plaintiff's fully-baked theory, Earthstone management's preliminary presentation to Bold "indicated an equity valuation for Bold (after factoring in all of Bold's

---

[252] Compl. ¶ 102.

[253] *See In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *7 (Del. Ch. Sept. 30, 2009) ("It is well within the business judgment of the Board to determine how merger negotiations will be conducted, and to delegate the task of negotiating to the Chairman and the Chief Executive Officer."); *In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *5 (Del. Ch. Sept. 30, 2011) ("Even if [the CEO] were conflicted, his efforts in negotiating the Merger Agreement and dealing with other potential acquirers do not taint the process. The Board was aware of [the CEO's alleged conflict and involvement] and was fully committed to the process."); *In re Plains Expl. & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *5 (Del. Ch. May 9, 2013) (rejecting claim that purportedly conflicted CEO's involvement as the point person for negotiations tainted the process because "the Board properly managed the conflict by overseeing the negotiations."); *In re Netsmart*, 924 A.2d 171, 189 (Del. Ch. Mar. 14, 2007) (declining to find a tainted sales process where company management and its financial advisor conducted due diligence and signed a confidentiality agreement with a potential target "without the Special Committee's involvement" and before the special committee was formed).

assets) of approximately $335 million"[254] while the Offer Letter, authorized by the Special Committee, bid only $325 million.[255]

With all of that said, the Special Committee's effectiveness is perhaps best illustrated by the fact that, on August 19, 2016, Stephens' updated analysis showed "the ownership interest of the Company in the resulting entity came out to around 38%–39%," yet the Offer Letter sent out that same day pinned Earthstone's ownership interest in the combined entity at 45%.[256] That Plaintiff believes the Special Committee "could have extracted [a] higher [ownership interest in the combined entity]," or "the special committee was too conservative in valuing [the company's] future prospects, does not plead a violation of the duty of care."[257] This point is made especially poignant by the undisputed fact that Earthstone's ownership interest in the combined entity was only 1% shy of the 40% target set by Stephens in its analysis.[258] This likely explains why Stephens did not hesitate to provide a

---

[254] Compl. ¶¶ 86–88.

[255] Compl. ¶¶ 112–13, 118.

[256] Compl. ¶ 118; Proxy Statement at 50.

[257] *Synutra Int'l*, 2018 WL 705702, at *5 (third alteration in original) (internal quotations omitted) (citing *MFW*, 67 A.3d at 516). *See also In re MFW S'holders Litig.*, 67 A.3d at 516 (noting that criticisms of the special committee's negotiating tactics and results packaged as due care claims were "the sorts of questions that can be asked about any business negotiation, and that are, of course, the core of an appraisal proceeding").

[258] *See* Compl. ¶¶ 14, 133. *See also Books-A-Million*, 2016 WL 5874974, at *16 (finding that the "difference [between two offers] is not so facially large as to suggest that the

fairness opinion when the Special Committee had negotiated the final terms of the deal.[259]

Plaintiff has not well-pled that the Special Committee failed to meet its duty of care in negotiating a fair price.[260]

---

Committee was attempting to facilitate a sweetheart deal for [the controlling stockholder]").

[259] *See* Compl. ¶ 133. When viewing the *bona fides* of Stephens' fairness opinion, one cannot help but be struck by what is *missing* in the Complaint – there are no allegations of banker conflicts, no allegations of misaligned incentives, either in Stephens' fee structure or otherwise, and no allegations of a lack of diligence or commitment to the engagement. Rather, it appears that Plaintiff simply does not like, or agree with, what Stephens had to say about the Transaction. That is not firm ground upon which to attack the opinion or the Special Committee's reliance upon it. *See Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062, at *17 (Del. Ch. Feb. 26, 2010), *aff'd*, 5 A.3d 586 (Del. 2010) (*"*[U]nder [8 *Del. C.*] § 141(e), where a board has relied on an expert's advice in making a decision, a due care claim challenging that decision must establish such facts as would make reliance on the expert opinion unreasonable.").

[260] Plaintiff's reliance on *In re Jefferies Gp., Inc. S'holders Litig.*, C.A. 8059-CS (Del. Ch. Nov. 4, 2013) (TRANSCRIPT) for the proposition that the Special Committee failed to exercise supervision over conflicted directors and price negotiations is misplaced. Answering Br. 53. In *Jefferies*, then-Chancellor Strine observed that the special committee delayed meeting and hiring its financial advisor for a month after its formation. *Jefferies*, C.A. 8059-CS, at 66. Moreover, the *Jefferies* special committee allowed conflicted directors to conduct price negotiations, failed to monitor the negotiations and determined the transaction exchange ratio in one meeting. *Id.* at 67–68, 71. Here, as stated, the Special Committee acted swiftly, diligently monitored the negotiations and actively deliberated the terms of the Transaction with the guidance of its independent advisors early on and throughout the process.

59

## D. The Stockholder Vote Was Informed and Not Coerced

*MFW* requires that "the vote of the minority is informed" and that "there is no coercion of the minority."[261] The Complaint does not allege coercion. It does allege, however, that the minority stockholders cast uninformed votes.[262]

Our law requires full and fair disclosure of "all material information within the board's control when it seeks shareholder action."[263] Information is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix

---

[261] *MFW*, 88 A.3d at 645.

[262] I note that Defendants urge the Court to hold that Plaintiff's disclosure criticisms come too late. Specifically, they point out, correctly, that Plaintiff received the Section 220 Documents before the stockholder vote, sat on that information and allowed the Transaction to close without saying a word, and now raises the disclosure claims post-closing in an attempt to undermine the Board's proper adoption and implementation of the *MFW* framework. I note as well that Defendants contend Plaintiff waived two of his four disclosure claims, as pled in the Complaint, because he failed to address those two claims in his Answering Brief. Joint Reply Br. in Supp. of Defs.' Mots. to Dismiss the Am. Compl. 25. Because I am satisfied that Plaintiff's disclosure allegations fail on the merits, I decline to reach Defendants' estoppel, laches and waiver arguments knowing full well that the arguments likely will surface again on similar facts, following a similar timeline, in connection with a similar challenge of a different transaction.

[263] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

of information made available."[264] An omitted fact is not material, however, simply because it "might be helpful."[265]

Plaintiff alleges the Proxy Statement misled stockholders and undermined the stockholders' approval of the Transaction in four respects: (1) it failed to disclose that the Special Committee directed Stephens to manipulate its contribution analysis; (2) it failed to disclose that Stephens would not commit to provide a fairness opinion; (3) it failed to disclose Lodzinski's role in the negotiations; and (4) it failed to disclose Bold's poor cash position prior to the Transaction. For reasons I explain below, none of these alleged disclosure violations state a claim or undermine confidence in the *bona fides* of the stockholder vote.

### 1. Changes in Stephens' Analysis

Plaintiff alleges the Proxy Statement failed to disclose that "Stephens' initial contribution analysis did not support a 60/40 Bold-Earthstone split [for the outstanding equity] in the combined company, and that, consequently, the Special Committee, with management's assistance, had to manipulate Bold and Earthstone's

---

[264] *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001) (internal quotations and alteration omitted). *See also Morrision v. Berry*, 2018 WL 3339992, at *9 (Del. July 9, 2018) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (citing *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[265] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

financial projections to make the consideration appear fair."[266]  Specifically, Plaintiff observes that the further out management took the projections, the more the contribution percentage of the combined-entity favored Bold.  This unremarkable observation reflects the previously discussed growth dynamic at the heart of the deal thesis; Bold is an early-stage company with much growth potential while Earthstone is a mature company with most of its organic growth already behind it.

According to Plaintiff, although Stephens' initial contribution analysis utilized 2017 and 2018 data, the Special Committee directed Stephens to add the Bold projections out to 2019 in order to lower the Earthstone stockholders' justified stake in the combined company.  Plaintiff correctly characterizes the growth dynamic but mischaracterizes the Proxy Statement's treatment of that issue.  Indeed, far from "manipulation," the change in Stephens' analysis to which Plaintiff refers (the addition of 2019 projections to Stephens' preliminary analysis) can be clearly discerned from Stephens' final analysis as disclosed in the Proxy Statement.[267]  That analysis does include 2019 projections, but the projections out to 2017 and 2018 are also clearly stated as is Stephens' contribution analysis methodology.[268]  From this, Earthstone stockholders could see for themselves how the contribution analysis

---

[266] Compl. ¶ 154.

[267] Proxy Statement at 66.

[268] *Id.*

changes based on the extent to which Bold's expected future growth (and cash flows) are considered in the calculation.

The Proxy Statement also made clear that, in Stephens' opinion, the growth dynamic between the two companies diminished the relevance of the contribution analysis as an indicator of value.[269] And it made clear that the value of the Transaction from Earthstone's perspective, among other synergies, was to add Bold's "valuable and highly prospective asset base" to Earthstone's more mature, already developed assets.[270] The Board was not obliged to characterize the progression of Stephens' analysis in a particular manner, or to disclose all iterations of Stephens' work for the Special Committee.[271] The Earthstone stockholders were

---

[269] *Id.* ("Stephens noted that given the difference in the development stages of Earthstone (mature) and Bold (early development), it did not regard the relative contribution metrics as meaningful for purposes of its valuation analysis.").

[270] Proxy Statement at 54. The Proxy Statement provided other bases for the slight difference between Stephens' initial analysis and the final offer—Bold had acquired additional acreage beyond what was initially valued, and that acreage was located in a section of the Permian Basin that was "rapidly increasing in value[]." Proxy Statement at 50–51.

[271] *See In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *16 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006) ("A disclosure that does not include all financial data needed to make an independent determination of fair value is not, however, *per se* misleading or omitting a material fact. The fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis."); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) (holding that stockholders are entitled to receive in the proxy statement "a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely"); *Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *6 (Del. Ch. Dec. 5, 1984) ("Proxy materials are only required to

given all that was needed to follow Stephens' analyses and ultimate opinions on value and fairness.

## 2. Stephens' "Refusal" to Commit to Provide a Fairness Opinion

Plaintiff next alleges that the Proxy Statement "omitted that Stephens told the Special Committee [at a September 13, 2016 meeting] that it 'cannot advise on Stephens' ability to provide a fairness opinion because it will be based on an analysis at the time the transaction closes.'"[272] Plaintiff argues that Stephens' reluctance to provide a fairness opinion was an acknowledgement that it was not comfortable with the Special Committee's push to get Stephens to separate from its initial contribution analysis (where it did not support a 60/40 Bold-Earthstone ownership allocation).[273] Plaintiff reads too much into Stephens' unwillingness in September to commit to provide a fairness opinion regarding a transaction that was months away from fruition. Indeed, if Stephens had committed to provide a fairness opinion in September before knowing the final terms of the Transaction, that actually would have been a problematic development worthy of disclosure to stockholders. But that is not what happened. Simply put, it is not reasonably conceivable that Earthstone

---

disclose all germane *facts*. They need not include opinions or possibilities, legal theories or plaintiff's characterization of the facts.") (emphasis in original).

[272] Compl. ¶ 157; Special Committee Meeting Minutes (Sept. 13, 2016) at ESTE0000246.

[273] Compl. ¶ 158.

stockholders would find it material that Stephens told the Special Committee that it could not commit to provide a fairness opinion in the midst of negotiations, two months before the Transaction terms were fixed.

### 3. Lodzinski's Role in the Negotiations

The Complaint takes aim at the Proxy Statement's "fail[ure] to disclose that on September 13, 2016, the Special Committee 'agreed that Mr. Lodzinski can speak directly to the representatives of Stephens regarding the valuation.'"[274]  Even if true, it is unclear how Plaintiff sees this undisclosed fact as altering the total mix of information available to stockholders.  The Complaint does not allege that Lodzinski steered Stephens' valuation.  Nor does it plead facts from which one might reasonably infer that the Special Committee's authorization of Earthstone's chairman and CEO to speak directly to the Special Committee's independent financial advisor was somehow problematic, especially considering that both Lodzinski and Stephens were in regular contact with, and reported directly to, the Special Committee.

And this Special Committee was no door mat.  It was actively engaged in the process, called its own shots and interfaced directly with management and its legal and financial advisors throughout the negotiations.  That Lodzinski, Earthstone's

---

[274] Compl. ¶ 162 (quoting ESTE000247).

Chairman, President and CEO, who also happened to have extensive experience and expertise in the oil and gas industry, was authorized to work directly with Stephens is not surprising and certainly not a material fact.

### 4. Bold's Liquidity Constraints

Last, but not least, Plaintiff alleges the Proxy Statement "omitted any disclosure regarding the fact that 'Bold [did] not have enough cash and drilling capacity to continue to run' and that, as of July 22, 2016, 'EnCap ha[d] reached its total capital commitment' and was not looking to invest any more of its own capital into Bold."[275] These allegations are flawed for two reasons.

First, the same Special Committee meeting minutes that Plaintiff cites to support its allegations of a material omission state clearly, in the sentence directly following the one Plaintiff quotes, that EnCap "will continue funding Bold."[276] From the Special Committee's vantage point, EnCap was willing to continue funding Bold even though it had "reached its total capital commitment." To have disclosed otherwise would have been misleading.

Second, the Proxy Statement includes pages of Bold's financial disclosures from which stockholders readily could assess for themselves Bold's liquidity.[277]

---

[275] Compl. ¶ 165 (alterations in Compl.) (quoting ESTE000075).

[276] Special Committee Meeting Minutes (July 22, 2016) at ESTE000075.

[277] *See, e.g.*, Proxy Statement 19, 94–101, F-7–F-64.

66

Here again, the Board was not obliged to characterize Bold's cash position, particularly when the facts were disclosed and neither the Special Committee nor the Board actually concluded that Bold was distressed and needed to sell.[278]

\* \* \* \* \*

Plaintiff has not pled "a reasonably conceivable set of facts showing that any or all of [the] enumerated [*MFW*] conditions did not exist [such] that [the] complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery."[279]  The *MFW* protective conditions were imposed at the right time, the Special Committee was properly authorized to negotiate from its inception and then exercised due care in doing so to arrive at a fair price.  The Proxy Statement adequately apprised Earthstone stockholders of the material facts they needed to know about the Transaction so they could cast informed votes.  The business judgment rule is, therefore, the operative standard of review.[280]

---

[278] *See* Special Committee Meeting Minutes (July 22, 2016) at ESTE000075 (stating Earthstone's management advised the Special Committee "that, even though EnCap will have finished making its capital commitment to Bold, it will continue funding Bold").

[279] *MFW*, 88 A.3d at 645.

[280] *Id.* at 644 (stating that where, as here, "the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard").

## E. The Operation of the Business Judgment Rule

When the business judgment rule standard of review applies, "the claims against the Defendants must be dismissed unless no rational person could have believed that the merger was favorable to [the] minority stockholders."[281] Stated differently, under the business judgment rule, "the court will defer to the judgments made by the corporation's fiduciaries unless the [Transaction] is so extreme as to suggest waste."[282] This court has observed that "it [is] logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully informed, uncoerced, independent stockholders to ratify the transaction."[283]

Here, a financial advisor opined that the Transaction was fair and 99.7% of disinterested stockholders who participated in the vote voiced their approval of the Transaction.[284] Moreover, the stockholder vote occurred against the backdrop of the Board having fully explained the rationale for the Transaction in the Proxy Statement. The rationale reflected the reality of the key driver of the Transaction as viewed by Earthstone's management and Special Committee: it made good sense to

---

[281] *Id.* at 654.

[282] *Books-A-Million, Inc.*, 2016 WL 5874974, at *1.

[283] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 901 (Del. Ch. 1999).

[284] Earthstone Energy, Inc., Current Report (Form 8-K) (May 15, 2017) at Item 5.07.

combine Bold's rich but undeveloped resources with Earthstone's more mature asset portfolio. This was particularly so given that Earthstone had publically disclosed that its business model for growth was to be "active in corporate mergers and the acquisition of oil and natural gas properties that have production and future development opportunities."[285] That Bold's assets consisted principally of acreage where there was "intense industry interest," and overlapped substantially with Earthstone's existing assets, bolstered the rationale for the Transaction.[286] There was no waste here.

## F. The Remaining Claims

Under the business judgment rule, "the court will defer to the judgments made by the corporation's fiduciaries," including its officers.[287] Accordingly, the claims against Lodzinski and Singleton as officers must be dismissed for the same reasons the claims against the Director Defendants fail. And, "[h]aving failed to plead a

---

[285] Compl. ¶ 38; Earthstone 2016 Annual Report at 8.

[286] Proxy Statement at 54. *See also* Compl. ¶ 38; Proxy Statement at 30.

[287] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments.").

claim for breach of fiduciary duty, the plaintiff likewise has failed to plead a claim for aiding and abetting."[288]

## III.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss must be GRANTED.  The Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

---

[288] *Synutra Int'l*, 2018 WL 705702, at *6 (citing *Malone v. Brincat*, 722 A.2d 5, 14–15 (Del. 1998)).